**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT WILLEY, on behalf of himself individually and on behalf of all others similarly situated, <br><br>             Plaintiff, <br><br>      v. <br><br> NICE-PAK PRODUCTS, INC. and PROFESSIONAL DISPOSABLES INTERNATIONAL, INC., <br><br>             Defendants. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff Robert Willey ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendants Nice-Pak Products, Inc. and Professional Disposables International, Inc. ("Defendants") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This class action arises out of the recent cyberattack and data breach ("Data Breach") resulting from Defendants' failure to implement reasonable and industry standard data security practices.

2.     Defendant Nice-Pak Products, Inc. is a corporation that provides "quality wet wipes" and other healthcare products and/or services to its clients.[1]

---

[1] https://www.nicepak.com/our-people (last accessed Sep. 13, 2023).

3.     Defendant Professional Disposables International, Inc. is a healthcare corporation and affiliate of Defendant Nice-Pak Products, Inc., that provides "products and solutions, educational resources, in-service training, and clinical support" to its clients, which are healthcare providers or similar companies.[2]

4.     Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendants on the mutual understanding that Defendants would protect it against disclosure—was compromised and unlawfully accessed due to the Data Breach.

5.     Defendants collected and maintained certain personally identifiable information of Plaintiff and the putative Class Members (defined below), who are (or were) employees at one or both of Defendants.

6.     The Private Information compromised in the Data Breach included Plaintiff's and Class Members' full names, addresses, Social Security numbers (collectively, "personally identifiable information" or "Private Information") and medical and health insurance information, which is protected health information ("PHI", and collectively with Private Information, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

7.     The Private Information compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target Private Information for its value to identity thieves.

8.     As a result of the Data Breach, Plaintiff and potentially thousands of Class Members, suffered concrete injury in fact including, but not limited to: (i) invasion of privacy; (ii) theft of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and

---

[2] https://pdihc.com/ (last accessed Sep. 13, 2023).

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

9.     The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect its employees' Private Information from a foreseeable and preventable cyber-attack.

10.     Defendants maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendants' computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

11.     Defendants disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

12.     Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct because the Private Information that Defendants collected and maintained is now in the hands of data thieves.

13.     Armed with the Private Information accessed in the Data Breach, data thieves have already engaged in identity theft and fraud (including the fraud suffered by Plaintiff described below), and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

14.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

15.     Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16.     Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

17.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

18.     Plaintiff seeks remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendants' data security systems, future annual audits, and adequate credit monitoring services funded by Defendants.

19.     Accordingly, Plaintiff brings this action against Defendants seeking redress for its unlawful conduct.

## **PARTIES**

20.     Plaintiff Robert Willey is a resident and citizen of Nanuet, New York. He is a former employee at Defendant Nice-Pak Products, Inc. and worked there from approximately 2016 to 2021. As a condition of Plaintiff's employment at Nice-Pak Products, Inc., he was required to provide his Private Information to Defendant Nice-Pak Products, Inc..

21.     Plaintiff received the Notice Letter, directly from Defendant Nice-Pak Products, Inc., via U.S. mail, dated August 14, 2023 (the "Notice Letter"). If Mr. Willey had known that Defendants would not adequately protect his Private Information, he would not have entrusted Defendants with his Private Information or allowed Defendants to maintain this sensitive Private Information.

22.     Defendant Nice-Pak Products, Inc. is a corporation duly formed and existing under the laws of the State of New York with a principal place of business in Rockland County, New York.

23.     Defendant Professional Disposables International, Inc. is a corporation duly formed and existing under the laws of the State of Delaware with a principal place of business in Bergen

County, New Jersey. Defendant Professional Disposable International, Inc. is an affiliate of Defendant Nice-Pak Products, Inc.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

25.     This Court has personal jurisdiction over Defendants because Defendant Nice-Pak Products, Inc. operates and maintains its principal place of business in this District, Defendant Professional Disposables International, Inc. operates in this District, and the computer systems implicated in this Data Breach are likely based in this District. Further, Defendants are authorized to and regularly conduct business in this District and makes decisions regarding corporate governance and management of its businesses in this District, including decisions regarding the security measures to protect its employees' Private Information.

26.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant Nice-Pak Products, Inc.'s governance and management personnel or inaction by those individuals that led to the Data Breach; Defendant Nice-Pak Products, Inc.'s principal place of business is located in this district; Defendant Nice-Pak Products, Inc. maintains Class Members' Private Information in this District; and Defendants caused harm to Class Members residing in this District.

## STATEMENT OF FACTS

***Defendants' Businesses***

27.     Defendant Nice-Pak Products, Inc. is a corporation that provides "quality wet wipes" and other healthcare products and/or services to its clients.[3]

28.     Defendant Professional Disposables International, Inc. is a healthcare corporation and affiliate of Defendant Nice-Pak Products, Inc., that provides "products and solutions, educational resources, in-service training, and clinical support" to its clients, which are healthcare providers or similar companies.[4]

29.     Upon information and belief, in the course of collecting Private Information from employees, including Plaintiff, Defendants promised to provide confidentiality and adequate security for employee data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

30.     Indeed, Defendant Nice-Pak Products, Inc.'s Privacy Policy provides that: "[w]e are committed to the protection of your information. We may store Personal Data or such information may be stored by third parties to whom we have transferred it in accordance with this Privacy Policy. We take what we believe to be reasonable steps to protect the Personal Data collected via the Site from loss, misuse, unauthorized access, inadvertent disclosure, alteration, and destruction."[5]

31.     Similarly, Defendant Professional Disposables International, Inc.'s Privacy Policy provides that: "[w]e are committed to the protection of your information. We may store Personal Data or such information may be stored by third parties to whom we have transferred it in

---

[3] https://www.nicepak.com/our-people (last accessed Sep. 13, 2023).
[4] https://pdihc.com/ (last accessed Sep. 13, 2023).
[5] https://www.nicepak.com/privacy-policy (last accessed Sep. 13, 2023).

accordance with this Privacy Policy. We take what we believe to be reasonable steps to protect the Personal Data collected via the Site from loss, misuse, unauthorized access, inadvertent disclosure, alteration, and destruction."[6]

32.     Plaintiff and the Class Members, as former and current employees at one or both of Defendants, relied on these promises and on this sophisticated business entity to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Employees, in general, demand security to safeguard their Private Information, especially when Social Security numbers and other sensitive Private Information is involved.

33.     In the course of their employment relationship, employees, including Plaintiff and Class Members, provided one or both of Defendants with at least the following Private Information:

   a.     names;

   b.     Social Security numbers; and

   c.     Addresses.

34.     Defendants had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' Private Information from involuntary disclosure to third parties.

***The Data Breach***

35.     On or about August 14, 2023, Defendant Nice-Pak Products, Inc. began sending Plaintiff and other victims of the Data Breach an untitled letter (the "Notice Letter"), informing them that:

> Nice Pak Products, Inc. and Professional Disposables International, Inc. understand the importance of protecting information. We are writing to inform you that we recently

---

[6] https://pdihc.com/privacy/ (last accessed Sep. 13, 2023).

identified and addressed a data security incident involving your information. This letter explains the incident, the measures we have taken, and steps you may consider taking in response.

**What Happened?**

On June 15, 2023, we identified unusual activity on certain devices in our network. We immediately implemented our response protocols, took measures to contain the activity, and launched an investigation. A cybersecurity firm also was engaged. We notified law enforcement and are supporting its investigation.

The evidence showed that between May 28, 2023 and June 15, 2023, an unauthorized actor viewed and obtained files stored on certain servers in our network. We conducted a careful review of the files and, on July 24, 2023, determined that one or more of the files contained your information.

**What Information Was Involved?**

The files contained your name, address, Social Security number, health plan member number, and for a small number of individuals, your health savings account number.[7]

36.     Upon information and belief, Defendants share a computer network(s), on which Plaintiff's and Class Member's Private Information was stored on at the time of the Data Breach.

37.     Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, , and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

38.     Upon information and belief, the cyberattack was targeted at Defendants, due to their statuses as employers that collect, create, and maintain Private Information on its computer networks and/or systems.

39.     Upon information and belief, Plaintiff's and Class Members' Private Information was, in fact, involved in the Data Breach.

---

[7] The "Notice Letter". A sample copy is available at https://www.doj.nh.gov/consumer/security-breaches/documents/nice-pak-products-20230814.pdf (last accessed Sep. 13, 2023).

40.     The files, containing Plaintiff's and Class Members' Private Information and stolen from Defendants, included the following: names, addresses, Social Security numbers, health plan member numbers, and health saving account numbers.[8]

41.     Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Defendants that included the Private Information of Plaintiff and Class Members.

42.     As evidenced by the Data Breach's occurrence, the Private Information contained in Defendants' networks was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

43.     Plaintiff's Private Information was accessed and stolen in the Data Breach and Plaintiff believes his stolen Private Information is currently available for sale on the dark web because that is the *modus operandi* of cybercriminals.

44.     Due to the actual and imminent risk of identity theft as a result of the Data Breach, Plaintiff and Class Members must, as Defendants' Notice Letter encourages, monitor their financial accounts for many years to mitigate the risk of identity theft.[9]

45.     In the Notice Letter, Defendants make an offer of 12 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, medical and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' Private Information.

---

[8] *Id.*
[9] *Id.*

46.     That Defendants are encouraging its current and former employees to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted individuals' Private Information *was* accessed, thereby subjecting Plaintiff and Class Members to a substantial and imminent threat of fraud and identity theft.

47.     Defendants had obligations created by contract, state and federal law, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

### *Data Breaches Are Preventable*

48.     Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

49.     The unencrypted Private Information of Class Members may end up for sale to identity thieves on the dark web, if it has not already, or it could simply fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

50.     Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

51. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[10]

52. To prevent and detect cyber-attacks and/or ransomware attacks Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders

---

[10] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Oct. 17, 2022).

supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[11]

53.     To prevent and detect cyber-attacks or ransomware attacks Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-     Apply latest security updates
-     Use threat and vulnerability management
-     Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-     Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-     Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-     Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

---

[11] *Id.* at 3-4.

-     Monitor for adversarial activities
-     Hunt for brute force attempts
-     Monitor for cleanup of Event Logs
-     Analyze logon events;

**Harden infrastructure**

-     Use Windows Defender Firewall
-     Enable tamper protection
-     Enable cloud-delivered protection
-     Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[12]

54.     Given that Defendants were storing the Private Information of its current and former employees, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

55.     The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of thousands of current and former employees, including Plaintiff and Class Members.

### *Defendants Acquire, Collect, And Store Employees' Private Information*

56.     Defendants acquire, collect, and store a massive amount of Private Information on their employees, former employees and other personnel.

57.     As a condition of employment, or as a condition of receiving certain benefits, Defendants require that employees, former employees and other personnel entrust them with highly sensitive personal information.

---

[12] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

58.     By obtaining, collecting, and using Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

59.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

60.     Plaintiff and the Class Members relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### *Defendants Knew or Should Have Known of the Risk Because Employers In Possession Of Private Information Are Particularly Suspectable To Cyber Attacks*

61.     Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information, like Defendants, preceding the date of the breach.

62.     Data breaches, including those perpetrated against employers that store Private Information in their systems, have become widespread.

63.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[13]

64.     In light of recent high profile data breaches at industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3

---

[13] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.

billion records, May 2020), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

65.     Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[14]

66.     Defendants knew and understood unprotected or exposed Private Information in the custody of employers, like Defendants, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

67.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

68.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[14] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last accessed Oct. 17, 2022).

69.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

70.     The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen––particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

71.     As businesses in custody of current and former employees' Private Information, Defendants knew, or should have known, the importance of safeguarding Private Information entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### Value Of Personally Identifiable Information

72.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[15] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

---

[15] 17 C.F.R. § 248.201 (2013).
[16] *Id.*

73.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[17]

74.    For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[18]

75.    Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.

76.    Criminals can also purchase access to entire company data breaches from $900 to $4,500.[19]

77.    Social Security numbers, which were compromised for some of the Class Members as alleged herein, for example, are among the worst kind of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

---

[17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[18] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[19] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

illegally using your Social Security number and assuming your identity can cause a lot of problems.[20]

78.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

79.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[21]

80.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

81.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card

---

[20] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 17, 2022).

[21] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Oct. 17, 2022).

information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[22]

82.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

83.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[23]

### Defendants Fail To Comply With FTC Guidelines

84.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

85.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they

---

[22] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*:
https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).

[23] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:*
https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[24]

86.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[25]

87.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

88.     The FTC has brought enforcement actions against employers for failing to protect employee data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

89.     These FTC enforcement actions include actions against employers over the compromised Private Information of its employees, like Defendants here.

---

[24] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 17, 2022).
[25] *Id.*

90.     Defendants failed to properly implement basic data security practices.

91.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

92.     Upon information and belief, Defendants were at all times fully aware of its obligation to protect the Private Information of its employees. Defendants were also aware of the significant repercussions that would result from its failure to do so.

***Defendants Fail To Comply With Industry Standards***

93.     As noted above, experts studying cyber security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

94.     Several best practices have been identified that a minimum should be implemented by employers in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

95.     Other best cybersecurity practices that are standard for employers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems;

protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

96.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

97.     These foregoing frameworks are existing and applicable industry standards for an employer's obligations to provide adequate data security for its employees. Upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON INJURIES & DAMAGES

98.     As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; (e) invasion of privacy; and (f) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further

breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

### The Data Breach Increases Victims' Risk Of Identity Theft

99.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

100.    The unencrypted Private Information of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

101.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

102.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

103.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to

manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victims

104.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[26]

105.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

106.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[26] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last visited on May 26, 2023).

107.     The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

108.     Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

109.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### Loss Of Time To Mitigate Risk Of Identity Theft And Fraud

110.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

111.     Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendants' Notice Letter encourages, monitor their financial accounts for many years to mitigate the risk of identity theft.

112.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, signing up for the credit monitoring and identity theft insurance offered by Defendant, and contacting financial institutions to ensure their accounts are secure.

113.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[27]

114.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[28]

115.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[29]

### Diminution Value Of Private Information

116.    PII is a valuable property right.[30] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison

---

[27] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[28] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

[29] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

[30] *See, e.g.,* Robert T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little

sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

117.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other entities in custody of Private Information often purchase Private Information on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed Private Information to adjust their insureds' medical insurance premiums.

118.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[31]

119.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[32,33]

120.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[34]

121.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[35]

---

cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[31] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[32] https://datacoup.com/

[33] https://digi.me/what-is-digime/

[34] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[35] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

122.     As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

123.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., Social Security numbers and names.

124.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

125.     The fraudulent activity resulting from the Data Breach may not come to light for years.

126.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

127.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' networks, amounting to potentially thousands of

individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

128.   The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### *Future Cost Of Credit And Identity Theft Monitoring Is Reasonable And Necessary*

129.   Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

130.   Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or his Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

131.   Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[36] The

---

[36] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

132.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

133.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

### Loss Of The Benefit Of The Bargain

134.    Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When submitting Private Information to one or both of Defendants under certain terms through a job application and/or onboarding paperwork, Plaintiff and other reasonable employees understood and expected that Defendants would properly safeguard and protect their Private Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received an employment position of a lesser value than what they reasonably expected to receive under the bargains they struck with one or both of Defendants.

### PLAINTIFF WILLEY'S EXPERIENCE

135.    Prior to the Data Breach Plaintiff Willey was employed at Nice-Pak Products, Inc. from approximately 2016 to 2021.

136.     In the course of enrolling in employment with Nice-Pak Products, Inc. and as a condition of employment, he was required to supply Nice-Pak Products, Inc. with his Private Information—including, but not limited to his name, address, and Social Security number.

137.     Plaintiff Willey is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

138.     At the time of the Data Breach—from May 28, 2023 through June 15, 2023—Defendants retained Plaintiff's Private Information in its system, despite no longer maintaining an employment relationship with Plaintiff for approximately two years.

139.     Plaintiff Willey received the Notice Letter, by U.S. mail, directly from Defendant Nice-Pak Products, Inc., dated August 14, 2023. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, address, Social Security number, health plan member number, and health savings account number. Plaintiff has spent significant time remedying the breach––time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

140.     Upon receiving the Notice Letter from Defendant Nice-Pak Products, Inc., Plaintiff Willey has spent significant time dealing with the consequences of the Data Breach including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, signing up for the credit monitoring and identity theft insurance offered by Defendant, and contacting financial institutions to ensure his accounts are secure.

141.    Subsequent to the Data Breach, Plaintiff Willey has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

142.    Plaintiff Willey additionally suffered actual injury and damages as a result of the Data Breach. Implied in his employment contract with Defendant Nice-Pak Products, Inc. was the requirement that it adequately safeguard his Private Information and that it would delete or destroy his Private Information after Defendants were no longer required to retain it. Plaintiff Willey would not have worked for Defendant Nice-Pak Products, Inc. had Nice-Pak Products, Inc. disclosed that it lacked data security practices adequate to safeguard Private Information.

143.    Plaintiff Willey further suffered actual injury in the form of damages and diminution in the value of his Private Information —a form of intangible property that he entrusted to Defendant Nice-Pak Products, Inc. for the purpose of employment, which was compromised by the Data Breach.

144.    Plaintiff Willey also suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy, especially his Social Security number, being in the hands of criminals.

145.     Plaintiff Willey has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his stolen Private Information being placed in the hands of unauthorized third parties and possibly criminals.

146.     Plaintiff Willey has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

147.     Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated.

148.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendants in August 2023 (the "Class").

149.     Excluded from the Class are Defendants' officers and directors, and any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

150.     Plaintiff hereby reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

151.     Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, according to the report submitted to the U.S. Department of

Health and Human Services, the Class consists at least 8,000 persons whose data was compromised in Data Breach.[37]

152.   <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.   Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.   Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e.   Whether Defendants owed a duty to Class Members to safeguard their Private Information;

f.   Whether Defendants breached their duties to Class Members to safeguard their Private Information;

g.   Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.   Whether Defendants knew or should have known that its data security systems and monitoring processes were deficient;

---

[37] *See* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Sep. 13, 2023).

      i.      Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

      j.      Whether Defendants' conduct was negligent;

      k.      Whether Defendants breached implied contracts for adequate data security with Plaintiff and Class Members;

      l.      Whether Defendants were unjustly enriched by retention of the monetary benefits conferred on it by Plaintiff and Class Members;

      m.      Whether Defendants failed to provide notice of the Data Breach in a timely manner; and,

      n.      Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

153.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

154.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

155.    <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

156.    _Superiority_. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

157.    Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

158.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendants owed legal duties to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b.    Whether Defendants' security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c.    Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

d.    Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

e.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

159.    Finally, all Members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice Letter from Defendants.

## CAUSES OF ACTION

### FIRST COUNT
**NEGLIGENCE**
**(On Behalf of Plaintiff and All Class Members)**

160.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 159 above as if fully set forth herein.

161.    Defendants required Plaintiff and Class Members to submit non-public Private Information as a condition of employment or as a condition of receiving employee benefits.

162.    Plaintiff and the Class Members entrusted their Private Information to Defendants with the understanding that Defendants would safeguard their information and delete it once the employment relationship terminated.

163.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duties included a responsibility to implement processes by which they could

detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

164.    Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

165.    Section 5 of the FTC Act, as interpreted and enforced by the FTC, prohibits the unfair act or practice by businesses, such as Defendants,[38] of failing to use reasonable measures to protect Private Information. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duties to protect Plaintiff and the members of the Class's sensitive Private Information.

166.    Plaintiff and members of the Class are within the class of persons that the FTC Act was intended to protect.

167.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against employers, which, as a result of failures to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm to its employees as that suffered by Plaintiff and members of the Class.

168.    Defendants' conduct constitutes negligence because it was in violation of Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards.

---

[38] https://www.ftc.gov/news-events/news/press-releases/2011/05/ftc-settles-charges-against-two-companies-allegedly-failed-protect-sensitive-employee-data

169.    Defendants' conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendants' magnitude, including, specifically, the immense damages that would result to Plaintiff and Members of the Class due to the valuable nature of the Private Information at issue in this case—including Social Security numbers.

170.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

171.    Defendants breached their duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

   a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

   b.    Failing to adequately monitor the security of their networks and systems;

   c.    Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

   d.    Allowing unauthorized access to Class Members' Private Information; and,

   e.    Failing to detect in a timely manner that Class Members' Private Information had been compromised.

172.    It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

173.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

174.    There is a temporal and close causal connection between Defendants' failure to implement security measures to protect the Private Information and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

175.    As a result of Defendants' negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

176.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

177.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**<u>SECOND COUNT</u>**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and All Class Members)**

178.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 159 above as if fully set forth herein.

179.    Plaintiff and Class Members were required to provide their Private Information to one or both of Defendants as a condition of their employment at one or both of Defendants.

180.    Plaintiff and Class Members provided their labor and their Private Information to one or both of Defendants in exchange for (among other things) Defendants' promise to protect their Private Information from unauthorized disclosure and to delete it once it was no longer necessary to maintain the Private Information for employment purposes.

181.    Defendants promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

182.    On information and belief, Defendants further promised to and represented it would comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

183.    Implicit in the agreement between Plaintiff and Class Members and the Defendants to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

184.     When Plaintiff and Class Members provided their Private Information to one or both of Defendants as a condition of their employment or employee beneficiary status, they entered into implied contracts with one or both Defendants pursuant to which Defendants agreed to reasonably protect such information.

185.     Defendants required Class Members to provide their Private Information as part of their regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their Private Information to one or both of Defendants.

186.     In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

187.     Plaintiff and Class Members would not have entrusted their Private Information to either Defendant in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

188.     Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

189.     Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with one or both of Defendants.

190.     Defendants breached their implied contracts with Class Members by failing to safeguard and protect their Private Information.

191.     As a direct and proximate result of Defendants' breaches of the implied contracts, Class Members sustained damages as alleged herein.

192.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

193.    Plaintiff and Class Members are also entitled to nominal damages for the breach of implied contract.

194.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### THIRD COUNT
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and All Class Members)

195.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 159 above as if fully set forth herein.

196.    This Count is pleaded in the alternative to Plaintiff's breach of implied contract claim.

197.    Plaintiff and Class Members conferred a monetary benefit upon Defendants in the form of their labor and by providing their valuable Private Information to one or both of Defendants.

198.    Plaintiff and Class Members provided one or both of Defendants their labor and Private Information on the understanding that Defendants would pay for the administrative costs of reasonable data privacy and security practices and procedures from the revenue it derived therefrom. In exchange, Plaintiff and Class members should have received adequate protection and data security for such Private Information held by Defendants.

199.   Defendants benefited from receiving Plaintiff's and Class Members' labor and from receiving their Private Information through its ability to retain and use that information for their own benefit. Defendants understood and accepted this benefit.

200.   Defendants knew Plaintiff and Class members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

201.   Because all Private Information provided by Plaintiff and Class Members was similarly at risk from a foreseeable and targeted data breach, Defendants' obligation to safeguard the Private Information they collected from their employees was inherent to the employment relationship.

202.   Defendants also understood and appreciated that Plaintiff's and Class Members' Private Information was private and confidential, and its value depended upon Defendants maintaining the privacy and confidentiality of that information.

203.   Defendants failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members.

204.   Defendants enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff' and Class Members' Private Information.

205.   Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead made calculated decisions to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

206.    Under the principles of equity and good conscience, Defendants should not be permitted to retain money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures mandated by industry standards.

207.    Defendants' enrichment at the expense of Plaintiff and Class Members is and was unjust.

208.    Defendants acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

209.    If Plaintiff and Class Members knew that Defendants had not secured their Private Information, they would not have agreed to provide their Private Information to Defendants.

210.    Plaintiff and Class Members have no adequate remedy at law.

211.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury as described herein.

212.    Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendants, plus attorneys' fees, costs, and interest thereon.

**FOURTH COUNT**
**VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICES ACT ("GBL")**
**(New York Gen. Bus. Law § 349)**
**(On Behalf of Plaintiff and All Class Members)**

213.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 159 above as if fully set forth herein.

214.    Defendants engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce and furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a), including but not limited to the following:

    a.    Misrepresenting material facts to Plaintiff and the Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Class Members' Private Information from unauthorized disclosure, release, data breaches, and theft;

    b.    Misrepresenting material facts to Plaintiff and the Class by representing that they did and would comply with the requirements of federal and state laws pertaining to the privacy and security of Class Members' Private Information;

    c.    Omitting, suppressing, and/or concealing material facts of the inadequacy of its privacy and security protections for Class Members' Private Information;

    d.    engaging in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of Class Members' Private Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws; and,

    e.    engaging in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Data Breach to the Class in a timely and accurate manner, contrary to the duties imposed by N.Y. Gen. Bus. Law § 899-aa(2).

215.     Defendants knew or should have known that its network and data security practices were inadequate to safeguard the Class Members' Private Information entrusted to it, and that risk of a data breach or theft was highly likely.

216.     Defendants should have disclosed this information because Defendants were in a superior position to know the true facts related to the defective data security.

217.     Defendants' failure to disclose constitutes false and misleading representations, which have the capacity, tendency, and effect of deceiving or misleading consumers (including Plaintiff and Class Members) regarding the security of Defendants' network and aggregation of Private Information.

218.     The representations upon which current and former employees (including Plaintiff and Class Members) relied were material representations (e.g., as to Defendants' adequate protection of Private Information), and current and former employees (including Plaintiff and Class Members) relied on those representations to their detriment.

219.     Defendants' conduct is unconscionable, deceptive, and unfair, as it is likely to, and did, mislead consumers acting reasonably under the circumstances. As a direct and proximate result of Defendants' conduct, Plaintiff and other Class Members have been harmed, in that they were not timely notified of the Data Breach, which resulted in profound vulnerability to their personal information and other financial accounts.

220.     Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Class Members' Private Information and that the risk of a data security incident was high.

221.   Defendants' acts, practices, and omissions were done in the course of Defendants' business of furnishing employment benefit services to consumers in the State of New York. 167.

222.   As a direct and proximate result of Defendants' unconscionable, unfair, and deceptive acts and omissions, Plaintiff's and Class Members' Private Information was disclosed to third parties without authorization, causing and will continue to cause Plaintiff and Class Members damages.

223.   Plaintiff and Class Members were injured because:

   a)   Plaintiff and Class Members would not have accepted employment at Defendants had they known the true nature and character of Defendants' data security practices;

   b)   Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of promises that Defendants would keep their information reasonably secure, and

   c)   Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of the promise to monitor their computer systems and networks to ensure that they adopted reasonable data security measures.

224.   As a direct and proximate result of Defendants' multiple, separate violations of GBL §349, Plaintiff and the Class Members suffered damages including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting

to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

225.   As a result, Plaintiff and the Class Members have been damaged in an amount to be proven at trial.

226.   Plaintiff brings this action on behalf of himself and Class Members for the relief requested above and for the public benefit to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members and the public from Defendants' unfair, deceptive, and unlawful practices. Defendants' wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

227.   Plaintiff and Class Members seek relief under N.Y. Gen. Bus. Law § 349(h), including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

228.   On behalf of himself and other members of the Class, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover his actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

229.   Also as a direct result of Defendants' violation of GBL § 349, Plaintiff and the Class Members are entitled to damages as well as injunctive relief, including, but not limited to, ordering Defendants to: (i) strengthen their data security systems and monitoring

procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendants and that the Court grant the following:

A.     For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.     For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.     For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.     prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.   requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the

retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v.     prohibiting Defendants from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

ix.    requiring Defendants to conduct regular database scanning and securing checks;

x.     requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.    requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.   requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiii.  requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential

personal identifying information to third parties, as well as the steps
affected individuals must take to protect themselves;

xv.     requiring Defendants to implement logging and monitoring programs
sufficient to track traffic to and from Defendants' servers; and

xvi.     for a period of 10 years, appointing a qualified and independent third
party assessor to conduct a SOC 2 Type 2 attestation on an annual basis
to evaluate Defendants' compliance with the terms of the Court's final
judgment, to provide such report to the Court and to counsel for the
class, and to report any deficiencies with compliance of the Court's final
judgment;

D.     For an award of actual damages, compensatory damages, statutory damages, and
nominal damages, in an amount to be determined, as allowable by  law;

E.     For an award of punitive damages, as allowable by law;

F.     For an award of attorneys' fees and costs, and any other expense, including expert
witness fees;

G.     Pre- and post-judgment interest on any amounts awarded; and

H.     Such other and further relief as this court may deem just and proper.


Dated: September 27, 2023          Respectfully submitted,

/s/  *Vicki J. Maniatis*
Vicki J. Maniatis, Esq.
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Phone: (865) 412-2700
vmaniatis@milberg.com

David K. Lietz*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Ave., NW, Suite 440
Washington, DC 20015
Phone: 866.252.0878
dlietz@milberg.com

*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and the Proposed Class*